UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

McKINLEY POLK                                          CIVIL ACTION

VERSUS                                                NO. 17-1164

UNITED STATES OF AMERICA                              MAGISTRATE JUDGE
                                                      JOSEPH C. WILKINSON, JR.


**FINDINGS OF FACTS AND CONCLUSIONS OF LAW**

This matter was referred to a United States Magistrate Judge for all proceedings and entry

of judgment in accordance with 28 U.S.C. § 636(c) upon the written consent of all parties. Record

Doc. No. 8. Plaintiffs Edmond Stokes and Jeremy Stokes, substituted as the proper parties for

deceased plaintiff McKinley Polk ("Polk" or "plaintiff"), seek damages pursuant to the Federal

Tort Claims Act, 2 U.S.C. § 2671, et seq., and Louisiana tort law for the injuries Polk allegedly

suffered as a result of a van accident caused by the allegedly negligent conduct of the defendant

United States' employee, Orlander S. Cassimere, Jr. ("Cassimere") on September 11, 2014. A non-

jury trial was conducted on January 25, 2018.

Having considered the evidence at trial, the record, the testimony of the witnesses, the

arguments and written submissions of the parties and the applicable law, the court makes the

following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

<u>FINDINGS OF FACT</u>

1.      Plaintiff was 58 years old at the time of the September 11, 2014 accident.  Joint Exhibit 1 at p. 34.  On that day, at about 3:45 p.m., Department of Veterans Affairs (the "VA") employee Cassimere drove a Veterans Administration transportation van over a bump on Canal Street in New Orleans, Louisiana, which caused his three passengers to be jostled.  Cassimere deposition at p. 40, lines 23-24; Joint Exhibit 10 (photographs of the VA van).

2.      On that date, Polk, Jason Ridgel III ("Ridgel"), and a wheel-chair bound veteran identified as "Mr. Cooper" were passengers in the van driven by Cassimere.  Record Doc. No. 11 at p. 4, ¶¶ 7(1)(2); Cassimere deposition at pp. 35, lines 24-25 and 36, lines 1-5.

3.      Cassimere is employed by the VA as a passenger van and bus driver.  <u>Id.</u> at pp. 12, lines 10-12 and 13, lines 4-6.  Cassimere was the driver of the VA van involved in the accident, and he was, at all pertinent times, acting in the course and scope of his employment with the VA.  Record Doc. No. 11 at p. 4, ¶ 7(3).

4.      Cassimere testified[1] that on September 11, 2014, his assignment route started at Perdido Circle.

> I would come out of the Perdido Circle, turn right, and then turn right again on Claiborne [Avenue], make my way over to the far left lane, when it's

---

[1] On stipulation of the parties, Cassimere testified by deposition after he failed to appear to testify at trial as requested by defense counsel.  He was not subpoenaed.  Record Doc. No. 18.

> safe, and I would then take a left turn onto Canal Street. . . . The route is
> from the Perdido Circle to 3500 Canal Street, Mental Health.

Cassimere deposition at pp. 30, lines 22-25 and 31, lines 24-25. When asked if he was familiar

with the route he took that day, Cassimere responded affirmatively. Id. at p. 31, lines 11-13.

5.     When the three passengers boarded the van at Perdido Circle, Polk was seated on

the passenger side, toward the front; Cooper was in his wheelchair in the rear on the passenger

side; and Ridgel was on the driver's side in the middle of the van. Record Doc. No. 22 at p. 51,

lines 2-12.

6.     Cassimere spoke to his wife on his cell phone while Polk, Ridgel and Cooper were

on board. Record Doc. No. 11 at p. 4, ¶¶ 7(4)(5).

7.     The testimony of Cassimere conflicts with the testimony of Ridgel as to when

Cassimere began his phone conversation with his wife and the speed at which Cassimere was

traveling at the time of the accident. This conflict is largely insignificant. Cassimere testified that

he spoke on his phone with his wife before the accident, while parked in Perdido Circle.

Cassimere deposition at pp. 34, lines 20-25 and 35, line 1. Ridgel testified that Cassimere spoke

to his wife while he was driving. More significantly, Cassimere and Ridgel agreed that Cassimere

was not talking on his cell phone when he hit the bump on Canal Street. Record Doc. No. 22 at

p. 55, lines 2-4; Cassimere's deposition at p.44, lines 2-7.

8.     Cassimere testified that he hit a bump near Warren Easton Charter High School

(3019 Canal Street, between Broad Street and Jefferson Davis Parkway).

> I hit the bump there, which I knew was there, but I didn't think I'd hit it that hard, you know, because I'm used to going down that street. And like I told the Veterans attorney, I just about know every crack, hump, bump in the streets, because I've gone through there so much.
> But I hit the bump. I, you know, bounced up a little bit. And as I passed it, Mr. Cooper yelled out, "Hey, I've fallen over." And I immediately signaled and pulled to the side, in that intersection right there on Jeff Davis.
> And I turned around. I looked. Sure enough, he had done tilted over. And I found that hard to believe, you know, until I got back there and I looked at - - looked down, looked at the chair. The restraints weren't on there.

Cassimere deposition at pp. 38, lines 8-25 and 39, line 1 (emphasis added). Cassimere testified that he bounced in his seat, which was an air-ride seat that moved up with him, about two to four inches. Id. at p. 42, lines 24-25.

9.     Ridgel testified that Cassimere hung up his phone when he turned onto Canal Street and then "punched it. Well, he accelerated, you know, too much down Canal Street and hit a pothole and that's when the front of the bus took a nose dive and catapulted the rear in the air and all three of us flew into the air." Record Doc. No. 22 at p. 54, lines 4-8. Ridgel clarified that Cassimere accelerated from a stop. Id. at p. 56, lines 6-8. Ridgel stated that the force of impact with the bump threw him "a foot into the air," id. at p. 56, line 19, and that he landed with half of his body in the aisle and the other half on the seat. Id. at p. 82, lines 15-16. When Cassimere was asked how fast he was driving when he passed over the bump, he answered that the "[s]chool zone was still on. So once I passed Warren Easton, maybe 30, 35 [miles per hour]." Cassimere

deposition, p. 41, lines 7-8. Ridgel estimated that Cassimere went from "zero to thirty [miles per hour] in, you know, maybe five seconds or something like that." Record Doc. No. 22 at p. 56, lines 4-5.

10.     Ridgell further testified that the bump in the street was a result of construction on Canal Street. He stated that

> [i]t was a pothole that they just laid, but it was real shallow like a dip. <u>I went over it</u> [as a passenger] . . . <u>hundreds of times</u>. Usually they would stop for it. You know, kind of slow down and, you know, go over it. . . .
> It was a pothole at one time, then they kind of filled it in. The way it settled, it left a hole like a dip. The bus hit it too fast. . . . I want to say it almost went across - - not exactly to the middle of the lane, but maybe a quarter of the lane.

<u>Id.</u> at pp. 60, lines 21-23, 25 and 61, lines 1-2, 6-9, 12-14 (emphasis added).

11.     Cassimere testified that when he pulled the van over after hitting the bump, he asked everyone if they were "all right," and all three passengers replied "[w]e're fine. We're good." Cassimere deposition at p. 43, lines 20-23. He further testified that the three passengers stated that they did not need to see a doctor. <u>Id.</u> at p. 44, lines 18-20.

12.     Cassimere and Ridgel testified that a VA police officer was outside of the VA Mental Health Clinic at 3500 Canal Street when the van arrived. Cassimere deposition at p. 45, lines 3-6; Record Doc. No. 22 at p. 59, lines 1-14. Cassimere, Ridgel and Polk all gave oral statements to the VA officer. <u>Id.</u>

13.     Polk and Cooper went to Urgent Care at approximately 4:45 p.m. and wrote statements concerning the accident.  Record Doc. No. 13-1.[2]

14.     I find Cassimere's testimony credible.  It was internally consistent, and he was candid in explaining that he had a heated phone conversation with his wife while in the van and that he ran over the bump on Canal Street, with which he was fully familiar, at a speed of 30-35 miles per hour.

15.     Ridgel's testimony that Cassimere accelerated at some point along Canal Street and hit the bump with enough force to jostle himself and the other two passengers is also credible. Ridgel's demeanor and candor concerning his personal medical history inspired confidence in his testimony.  Ridgel's occasional lapses of memory concerning events that happened more than three years ago amount to nothing more than insignificant trivialities that in no way alter my finding that Ridgel is credible.  As the United States Fifth Circuit Court of Appeal's Pattern Jury Instructions state,

> a simple mistake by a witness does not necessarily mean that the witness did not tell the truth as he or she remembers it.  People may forget some things or remember other things inaccurately.  If a witness made a misstatement, consider whether that misstatement was an intentional falsehood or simply an innocent mistake.  The significance of that may depend on whether it has

---

[2] The court ruled at trial that the contents of Polk's and Cooper's written statements and of the investigating VA officer's written report are inadmissible hearsay within hearsay and do not fall under any of the evidentiary exceptions in Federal Rules of Evidence 803 or 807.  Record Doc. No. 22 at p. 6, lines 13-17; Record Doc Nos. 13 and 14.

to do with an important fact or with only an unimportant detail.

Fifth Circuit Pattern Jury Instructions 2.11 (2014). In this case, Ridgel's lapse of memory concerning whether Polk was jostled out of his seat and the amount of time it took for the van to get from the scene of the accident to the VA Mental Health Clinic is entirely innocent.

16. Cassimere was going approximately 30 to 35 miles per hour on Canal Street when he hit a bump, which he knew existed. The impact was severe enough to cause Cassimere to bounce up and Cooper's wheelchair to tilt over against the side of the van.

17. Based on Ridgel's credible testimony concerning the extent of the bump, Cassimere's testimony admitting that he drove at 30 to 35 miles per hour directly over a road hazard on Canal Street with which he was familiar and the other believable evidence, the court finds that Cassimere did not drive as a reasonably prudent VA transport van driver should have in a similar situation and was negligent in failing to avoid or slow down for a known obstacle on a route he drove frequently. See Thissel v. Commercial Union Ins. Co., 476 So.2d 851, 855 (La. App. 2d Cir. 1985) (driver who was familiar with area frequented by pedestrians should have seen and attempted to avoid hitting the plaintiff pedestrian, given that he had driven through the area several times earlier in the evening).

18. Edmond Stokes, one of Polk's sons, testified at trial that he observed a change in his father's back and neck conditions after the accident on September 11, 2014. Record Doc. No.

22 at p. 37, lines 9-13. In describing his observations, Stokes stated that Polk "pretty much was down all the time, you know. . . . I mean he would move around. But after the accident, it was . . . a real change after that." Id. at pp. 37, lines 21-23 and 38, lines 8-10.

19.    While the court finds that Stokes presented credible testimony at trial, his testimony focused on his father's complaints rather than on specific descriptions of his own observations of his father's physical condition worsening after the September 11, 2014 accident. His description of his father's behavior after the accident was conclusory, lacking in descriptive detail, and unconvincing as to any substantial exacerbation of his father's condition post-accident. I cannot conclude based on Stokes's testimony, especially when compared with Polk's medical records, that the jostling Polk experienced in the incident caused anything more than slight exacerbation or aggravation of Polk's previously existing neck and back ailments.

20.    Polk's medical records provide a more comprehensive view of Polk's pre- and post-accident neck and back conditions, and the deposition testimony of Polk's orthopedist, Dr. Michael Zeringue ("Dr. Zeringue"), provides a clearer view of how the subject accident affected Polk's pre-existing degenerative conditions.

21.    The evidence, including the credible medical record summary evidence presented at trial by Alice Adams, a registered nurse and legal nurse consultant; Dr. Zeringue's deposition testimony; and Polk's medical records, weighs in favor of a finding that the subject accident was

the proximate or legal cause of a much less than severe aggravation of Polk's pre-existing degenerative neck and back conditions.  Specifically, the accident in which Polk was injured more probably than not caused him to suffer a slight exacerbation of his serious pre-existing degenerative disc disease and a continued–though not significantly increased– restriction of his physical capabilities.

22.     Although Polk was not wearing a seatbelt at the time of the accident, applicable Louisiana statutory law cited below prohibits that fact from being considered in any comparative fault analysis.  The court allocates 15 percent of the fault in this case to the City of New Orleans for its failure to take corrective measures to prevent harm from the unreasonable risk presented by the bump on Canal Street.  Finally, the United States is apportioned 85 percent of the fault in this case for the negligence of its employee, Cassimere, who was acting in the course and scope of his employment when he negligently drove over bump in the street, that he knew was in the path of his van route that day, without slowing to a speed that would not cause his passengers to be dislodged from their seats.

23.     Because the government focused much effort on its argument that the medical records show little to no difference between Polk's pre- and post-accident neck and back conditions, and because I find that the records substantially support a finding that defendant's negligence resulted only in a minor exacerbation of his pre-existing conditions, I will address

Polk's medical history in detail.

24.     Adams wrote a chronology of Polk's medical records, which begins with an MRI of his cervical spine on December 10, 2011.  Record Doc. No. 22 at p. 9, lines 1-12; Joint Exhibit 11 at p. 3. At trial, Adams reviewed the most pertinent parts of her written summary of Polk's medical records.  She testified that the first time that Polk reported recurrent back pain, according to his medical records, was on January 24, 1974.  Record Doc. No. 22 at p. 15, lines 18-24.

25.     Thus, Polk's back pain began 44 years ago and continued until his death in 2017. After experiencing continuous neck and back pain following a work-related injury in 1991, Polk underwent back surgery in 1992.  His pain continued after a car accident in 2009, and he was diagnosed with degenerative changes in his cervical spine in 2011.  Polk was scheduled to have surgery to address those cervical spine issues in June 2013, but he did not have the surgery.  That same year, he was diagnosed with degenerative changes in his lumbar spine.

26.     During a doctor's visit in August 2014, about one month before the subject incident, Polk complained of severe, daily neck and back pain, which he attributed to his 1991 injury. Polk's complaints of neck and back pain continued after the September 11, 2014 accident, and his degenerative disc disease diagnosis was confirmed one month before his death in March 2017.

27.     An examination note from January 24, 1974, included in Polk's medical record from September 1, 2015, shows that Polk responded affirmatively

to the question regarding 'Recurrent back pain'. . . . There is no indication he had back surgery prior to military service. Note dated 01/15/1975 shows the veteran reported lower back [pain] for 15 years, prior to military service. The provider noted that the x-ray findings of reversed spondylolisthesis[3] could cause symptoms and was developmental in nature. Note dated 06/13/1975 shows the veteran complained of back pain for two weeks prior, possibly associated with heavy lifting. . . . Ortho note dated 06/20/1975 shows the provider felt the veteran's symptoms probably result from episodes of excess strain from heavy lifting. . . . Entrance Exam for the Navy dated 03/15/1978 is negative for any complaints of back pain.

Joint Exhibit 1 at p. 249.

28.     In describing his history of back pain, Polk reported

he has been having back problems since he was in the Marine Corps in the mid 1[9]70's. He reports an injury when he was running, but he cannot give any specific details regarding the event or injury. . . . He states after the service, he went to have back surgery in February 1991 in New Orleans. Since that time, he reports he is unable to work. He states he has been told he needs another surgery, but does not want to. He reports he had an epidural injection in Lafayette that helped a little. He states he has chronic back pain of a 6-7/10 on a daily basis, but it will increase with prolonged walking, sitting and laying down.

Id. at p. 241.

29.     On January 31, 2012, Polk complained of "neck and back pain that originated from an oil rig injury in 1991." Polk also reported that he had back surgery in 1992, and he rated his pain at a 7 on a scale of 1 to 10 that day. Id. at p. 152.

30.     A neurosurgery consult note from November 2, 2012 reflects that Polk complained

---

[3]Spondylolisthesis (pronunciation: \'spän-də-lo-lis-'the-səs\) is "forward displacement of a lumbar vertebra on the one below it and especially of the fifth lumbar vertebra on the sacrum producing pain by compression of nerve roots." MedlinePlus Medical Dictionary (Merriam-Webster, Inc. 2017), http://www.merriam-webster.com/medlineplus/Spondylolisthesis (visited March 21, 2018).

of neck and back pain stemming from a motor vehicle accident in 2009. A lumbar MRI done that day showed lumbar spondylosis, id. at p. 151, which, according to nurse Adams, "is a form of narrowing of the spinal canal that's around the spinal cord. It is degenerative." Record Doc. No. 22 at p. 19, lines 2-6.

31.     Polk went to urgent care on May 13, 2013, with complaints of excruciating neck and back pain that had been ongoing for four days. Joint Exhibit 1 at p. 126. He requested a Toradol injection, id. at p. 123, which according to nurse Adams is "generally given for acute pain. It's more for inflammation." Record Doc. No. 22 at p. 20, lines 3-6.

32.     During a neurosurgery consult on May 16, 2013, Polk complained of neck pain and weakness in his arms. Joint Exhibit 1 at p. 259. Polk stated that he had neck pain that radiated through his shoulder blades into his arms for the last year and that the pain was worse on his left side. Id. Polk also complained of low back pain, caused by walking, and bilateral leg weakness. Id. Polk was told that he needed neck surgery to decompress the pressure on his cervical spine, and he was agreeable. Id. at p. 264; Record Doc. No. 22 at p. 20, lines 23-25.

33.     Polk had a follow-up visit with his primary care provider on July 1, 2013, and he continued to complain of weakness in his legs and lower back pain. Joint Exhibit 1 at p. 106. Polk rated his pain that day at a level of 8/10, which was triggered by walking, sitting or standing for prolonged periods. Id. at p. 115. He reported that he did not have the scheduled neurosurgery on

June 26, 2013.  Id. at p. 106.

34.    Polk underwent an electromyographic study on September 12, 2013, after he complained of lower extremity weakness and worsening lower back pain.  Id. at p. 104.  This particular procedure showed "evidence of advanced lumbar spine disease."  Id.

35.    A letter to Polk dated July 23, 2014, explains that the MRI of his lumbar spine revealed progressive degenerative disc disease and stenosis, which is spinal canal narrowing.  Id. at pp. 42-44; Record Doc. No. 22 at p. 24, lines 6-16.

36.    Polk's first visit to Dr. Michael Zeringue ("Dr. Zeringue") was on August 20, 2014, three weeks before the subject accident.  Dr. Zeringue's note from that day states that Polk complained of "severe back and neck pain," which Polk stated he had been experiencing every day since his back surgery in 1991 after an offshore rig accident.  Joint Exhibit 4 at p. 66.  Polk described the pain "as a numbness, weakness, shooting, tender sharp pain. . . . Activities that worsen the pain are standing, bending, walking, mopping, sweeping, standing in one spot. . . . Over the past two years [the] pain has been getting worse."  Id.  Dr. Zeringue's plan from this initial visit included having Polk fill out a pain contract, which was an agreement that Polk would only obtain pain medication from Dr. Zeringue and his facility.  Id. at p. 67; Record Doc. No. 22 at p. 25, lines 11-14.

37.    Dr. Zeringue testified in his deposition that during this initial visit on August 20,

2014, he diagnosed Polk with lumbar radiculopathy, cervical radiculopathy, lumbar facet disease, cervical facet disease, cervical degenerative disease and chronic pain syndrome.[4] Zeringue deposition at pp. 7, lines 13-15 and 8, lines 8-14.

38.     The urgent care note from the day of the subject incident, September 11, 2014, indicates that Polk went to urgent care "because of an accident while he was riding the VA shuttle bus." Joint Exhibit 1 at p. 34. The note states that the

> [patient] has a long [history] of chronic neck and back pain, for which he takes percocet. [Patient] states that the driver hit a bump while he was riding on the van. He 'went up in the air' and when he landed the bar hit the back of his neck. Now he says he is having a 'new' pain. No radiation of the pain. No significant point tenderness of neck.

Id. An x-ray of Polk's spine showed a progression of moderate multilevel degenerative disc disease. Id. at p. 36.

39.     Dr. Zeringue saw Polk again on September 18, 2014, seven days after the subject accident. Zeringue deposition at p. 9, lines 10-13. Polk complained that his lower back pain and neck pain had increased from his prior visit on August 20, 2014. Id., lines 14-25. Dr. Zeringue testified that he did not diagnose a change from Polk's August 20 visit to his September 18, 2014 visit. Id. at p. 10, lines 11-13. He also confirmed that Polk had issues with his joints, facet joints, discs, and with nerve pain on August 20, 2014, and that "Polk ha[d] a bad back and a bad neck." Id. at pp. 26, lines 23-25 and 27, lines 1-6.

---

[4] Radiculopathy is a "[d]isorder of the spinal nerve roots," Stedmans Medical Dictionary, available on Westlaw at Radiculopathy, STEDMANS 748650, that "typically causes pain, numbness, or weakness in the part of the body which is supplied with nerves from that root." MedlinePlus, http://c.merriam-webster.com/medlineplus/Radiculopathy (visited March 21, 2018).

40.     Dr. Zeringue testified that he reviewed a cervical MRI done between Polk's September 18 and October 16, 2014 visits, which showed "multi-level disc herniations and neural compression at multiple levels.  It also showed concern at the [C]6-7 level for an alteration in the cord signal, which we call myelomalacia."  Id. at p. 11, lines 4-12.

41.     When asked whether it is normal for a patient to have a positive straight leg test –indicating nerve root impingement, or sciatica–on one visit and a negative test at the next, Dr. Zeringue answered that, "[i]t can happen with people who have chronic pain.  But I believe in Mr. Polk's case, that he's having an exacerbation of his underlying problem, and that's why he's having those physical exam findings . . . now that he didn't have when I first saw him."  Id. at pp. 10, lines 5-8 and 12, lines 15-25 (emphasis added).

42.     Dr. Zeringue agreed that it is "more probable than not that the accident on September 11, 2014, as Mr. Polk described to [me], aggravated his neck and back condition that he previously had."  Id. at p. 16, lines 10-15.  Dr. Zeringue stated that, "I think in Mr. Polk's case, there's no substantial changes in his MRI from before and after the accident."  Id. at p. 31, lines 5-12 (emphasis added).

43.     Dr. Zeringue even noted an improvement on November 13, 2014, in that Polk's pain was "not as radicular as it used to be."  Id. at p. 32, lines 11-17.

44.     Polk received a lumbar epidural steroid injection from Dr. Joseph Gillespie on July 29, 2015.  Joint Exhibit 8 at p. 1.

45.     X-rays taken on September 1, 2015 of Polk's thoracolumbar spine showed arthritis. Joint Exhibit 1 at p. 247.

46.     Polk's initial visit with Dr. Ilyas Munshi, a neurological surgeon, was on June 23, 2016. Joint Exhibit 2 at p. 1. Dr. Munshi diagnosed Polk with radiculopathy of the cervical spine. Id. at p. 4. Nurse Adams noted that Dr. Munshi did not appear to have had access to any of Polk's prior medical records or studies when he made this diagnosis. Record Doc. No. 22 at p. 28, lines 15-18.

47.     An MRI of Polk's cervical spine done on July 27, 2016, without Polk's prior imaging studies for comparison, showed diffuse degenerative disc disease, which is the narrowing of the bony canal and various other spine locations. Joint Exhibit 6 at p. 1; Record Doc. No. 22 at p. 29, lines 6-20.

48.     Finally, on February 10, 2017, a PET scan of Polk's entire body was conducted. Record Doc. No. 22 at p. 29, lines 22-25. Nurse Adams explained that a "PET scan is whenever you inject a dye and, if there's cancer or any type of inflammation in the lymph nodes, it will light up in the findings." Id. at p. 30, lines 3-5. She testified that the PET scan study revealed that Polk had degenerative disc disease in his lumbar spine. Id., lines 9-10.

49.     Before the subject accident, Polk was prescribed and took a variety of pain medications–Tramadol, Gabapentin, Salsalate, Norco, Soma, Toradol, Percocet and Hydrocodone–to relieve his neck and back pain.[5] Joint Exhibit 11 at pp. 2-15. After the accident,

---

[5] Tramadol hydrochloride (Ultram) is a centrally acting, synthetic opioid analgesic that "is indicated for the management of moderate to moderately severe chronic pain in adults who require around-the-clock treatment of their pain for an extended period of time." Physicians' Desk Reference 2519, 2520 (66th ed. 2012). Gabapentin "is an anti-epileptic drug . . . used in adults to treat neuropathic pain (nerve pain)." Drugs.com (Cerner Multum, Inc. 2000-2018), https://www.drugs.com/gabapentin.html (visited March 22, 2018). Salsalate is an anti-inflammatory drug that "is used to reduce pain, swelling, and joint stiffness caused by arthritis. Id. at Salsalate. Norco (generic name: acetaminophen and hydrocodone) "contains a combination of acetaminophen and hydrocodone. Hydrocodone is an opioid pain medication. . . . Acetaminophen is a less potent pain reliever that increases the effects of hydrocodone. Norco is used to

he was prescribed and took Flexeril, Lyrica, Percocet and Toradol for his neck and back pain.[6] Id. at pp. 16-35. His medical records reveal a history of cocaine use and a positive confirmation of cocaine use, which resulted in his discharge from Dr. Gillespie's clinic in September 2015. Joint Exhibit 3 at p. 4.

50. Polk died in March 2017 for reasons unrelated to the subject van incident. Record Doc. No. 11 at p.4, ¶ 7(6).

51. Considering the foregoing and the case law cited below, the court finds that the sum of $10,000.00, before any reduction for the comparative fault of the city, adequately compensates plaintiffs for all general damages, including past pain, mental anguish and anxiety, suffering and loss of enjoyment of life, which Polk suffered as a direct and proximate result of the fault of Cassimere, acting within the course and scope of his employment with the VA. This amount reflects the small amount of exacerbation only, resulting from this incident, of Polk's severe pre-

---

relieve moderate to moderately severe pain." Id. at Norco. Soma (generic name: carisoprodol) is "used to relieve discomfort associated with short-term, painful musculoskeletal conditions." PDR.net, (PDR, LLC 2018), http://www.pdr.net/pdr-consumer-monograph/soma?druglabelid=2128&ConsumerId=1409 (visited March 22, 2018). Toradol is an anti-inflammatory drug that "is used short-term (5 days or less) to treat moderate to severe pain." Drugs.com (Cerner Multum, Inc. 2000-2018), https://www.drugs.com/toradol.html (visited March 22, 2018). Percocet is a combination of oxycodone, an opioid pain reliever, and acetaminophen, a less potent pain reliever that increases the effects of oxycodone. Percocet is used to relieve moderate to severe pain. Id. at Percocet. Hydrocodone is an opioid, also known as a narcotic, pain medication. Extended release forms of hydrocodone are used for "around-the-clock treatment of severe pain." Id. at Hydrocodone.

[6] Flexeril (generic name: cyclobenzaprine) is a muscle relaxant used in combination with rest and physical therapy for the relief of severe and painful conditions, such as muscle spasms due to sprains, strains or pulls. Drugs.com (Cerner Multum, Inc. 2000-2018), https://www.drugs.com/flexeril.html (visited March 22, 2018). Lyrica is an anti-eplieptic drug that is used to treat pain caused by nerve damage in people with diabetes or spinal cord injuries. Id. at Lyrica.

existing conditions.

52.     Polk incurred medical expenses in the amount of $1,042.51 as a direct result of the accident in question. Joint Exhibit 2 at p. 6; Joint Exhibit 3 at pp. 6 and 18; Joint Exhibit 4 at pp. 7, 10 and 33. The court finds that these were necessary and reasonable expenses for medical services rendered as a direct and proximate result of the fault of Cassimere, acting within the course and scope of his employment with the VA, and that the sum of $1,042.51 adequately compensates for all medical expenses Polk incurred resulting from the accident. There are no future medical expenses.

53.     In summary, the court finds that Polk incurred total exacerbation damages, as a direct and proximate result of the accident in the amount of $11,042.51 (including $10,000 in general damages, including past pain and suffering, loss of enjoyment of life, mental anguish and anxiety; and past medical expenses, in the amount of $1,042.51). The United States is liable for 85 percent of this amount, as set out above.

<u>CONCLUSIONS OF LAW</u>

1.     This court has jurisdiction over this matter pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq, and 28 U.S.C. § 1331. Venue is proper in the Eastern District of Louisiana because the incident occurred in this district.

2.     "Under the [Federal Tort Claims Act] the United States is liable to the same extent

as a private party for certain torts of federal employees acting within the scope of their employment.  The United States's liability for tort claims is according to the law of the state where the alleged tortious action occurred."  <u>Langhoff v. U.S.</u>, 805 F.Supp.2d 272, 276 (E.D. La. 2011) (citing 28 U.S.C. § 2674; <u>U.S. v. Orleans</u>, 425 U.S. 807, 813 (1976); <u>Owen v. U.S.</u>, 935 F.2d 734, 737 (5th Cir. 1991)).  Because the vehicular accident at issue in this case occurred in New Orleans, Louisiana, the principles of Louisiana tort law, including the elements of damages permitted under Louisiana tort law, govern this case.  <u>Id.</u>

3.      Liability in a personal injury suit brought under Louisiana law is determined under the duty-risk analysis.  <u>Waters v. Oliver</u>, 223 So.3d 37, 43 (La. App. 4th Cir. 2017) (citing <u>Brewer v. J.B. Hunt Transp., Inc.</u>, 35 So.3d 230, 240 (La. 2010).

4.      The duty-risk analysis requires that a plaintiff prove the following six factors: (1) the defendant had a duty to conform his conduct to a specific standard of care [the duty element]; (2) the defendant failed to conform his conduct to the appropriate standard of care [the breach element]; (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries [the cause-in-fact element]; (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries [the legal cause/scope of liability element]; and (5) actual damages [the damages element].  Whether a duty is owed is a question of law; whether a defendant failed to conf[o]rm his conduct to the appropriate standard of care and has breached a duty owed is a question of fact.

<u>Id.</u> at n.8 (citations omitted).  "A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability."  <u>Lemann v. Essen Lane Daiquiris, Inc.</u>, 923 So.2d 627, 633 (La. 2006) (citing <u>Mathieu v. Imperial Toy Corp.</u>, 646 So.2d 318, 321 (La. 1994)).

5.      Plaintiff must prove each element of negligence by a preponderance of the evidence.

Fuller v. Hillyard, No. 00-2791, 00-2953, 2002 WL 10524, at *2 (E.D. La. Jan. 2, 2002) (citing

Theriot v. Lasseigne, 640 So.2d 1305, 1310 (La. 1994); Ryland v. Liberty Lloyds Ins. Co., 630

So.2d 1289 (La. 1994)); accord Cloud v. Peart, 40 So.3d 467, 471 (La. App. 3d Cir. 2010).

Whether a duty is owed is a question of law. Fuller, 2002 WL 10524, at *3 (citing Peterson v.

Gibraltar Savings & Loan, 733 So.2d 1198, 1204 (La. 1999)). Whether a defendant has breached

a duty is a question of fact. Id. Under Louisiana law, cause-in-fact is a "but for" inquiry in which

the court examines whether the injury would have occurred but for the defendant's substandard

conduct. Id. (citing Theriot, 640 So.2d at 1310; Faucheaux v. Terrebonne Consol. Gov., 615 So.2d

289 (La. 1993)).

      6.     A common carrier is defined under Louisiana law as follows:

> "Common carrier by motor vehicle" means any person, other than a contract carrier by bus, the essential nature of whose business compromises engaging in, soliciting, or accepting household goods, passengers, or waste, for intrastate transportation for hire, charge, or compensation as an employment or holding himself out as so available to the public generally and indiscriminately for such business, whether or not the business is conducted over a regular route, between fixed termini, within a defined area, or upon a regular or irregular schedule.

La. Rev. Stat. § 45:162(5)(a). The VA van involved in the subject incident is not a common carrier

under this statutory definition. Defendant's VA van was available only to U.S. military veterans

and did not offer transportation to the public generally or indiscriminately. See 38 C.F.R. §

70.70(a) ("This subpart implements the Veterans Transportation Service (VTS), through which VA

transports eligible persons to or from a VA or VA-authorized facility or other place for the purpose

of examination, treatment, or care.").

7.      Thus, defendant is not subject to the higher standard of care applied to common carriers.  See Ellis v. Louisiana-I Gaming, 930 So.2d 186, 189 (5th Cir. 2006) (citing Kerns v. Hyatt Corp., No. 98-3682, 1999 WL 562720, at *2 (E.D. La. July 29, 1999)) (finding that while the complimentary Hyatt hotel shuttle bus was not a common carrier, such a private carrier still owes an ordinary standard of care to its passengers).

8.      The applicable standard of care in this case is the general negligence standard. Under Louisiana law, "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."  La. Civ. Code art. 2315(A).

9.      "On the road, drivers have a duty to maintain a proper lookout and to see what should be seen." Andrianopoulis v. Gross, No. 09-2367, 2009 WL 2390609, at *2 (E.D. La. July 30, 2009) (citing Davis v. Smith, 796 So.2d 765, 769 (La. App. 2d Cir. 2001); Thissel, 476 So.2d at 851).  Further, "[a] driver has a duty to drive defensively from the time the driver . . . notices other hazards posing the potential for resulting damage.  That duty may include the duty to slow down . . . ." Edwards v. Horstman, 687 So.2d 1007, 1011 (La. 1997) (citations omitted).

10.     Louisiana courts have long held that a motorist

        must use such diligence and care in the operation of his vehicle as is
        commensurate with the circumstances.  The greater the danger, the greater
        the degree of care required.  Moreover, a host driver has a duty to operate
        his vehicle with reasonable care under the prevailing circumstances for the
        benefit of guest passengers who might be injured if he fails to do so.

Guilliams v. Succ'n of Harrel, 774 So.2d 325, 329 (La. App. 3d Cir. 2000) (citations omitted).

11.     The court finds that Cassimere, while working within the course and scope of his

employment with the VA, breached his duty of reasonable care to his guest passengers, including

Polk, in failing to maintain a proper lookout, failing to slow down and failing to avoid driving over

the bump on Canal Street, which he knew existed, at a prudent rate of speed, thereby exposing his

passengers to potential injury.

12.    "The test for determining the causal relationship between an accident and a

subsequent injury is whether the plaintiff proved through medical or lay testimony that it is more

probable than not that the subsequent injuries were caused by the accident." Chavers v. Travis,

902 So.2d 389, 394 (La. App. 4th Cir. 2005) (citing Maranto v. Goodyear Tire & Rubber Co., 650

So.2d 757, 759 (La. 1995); Jones v. Peyton Place, Inc., 675 So.2d 754, 763 (La. App. 4th Cir.

1996)).

13.    A defendant takes his victim as defendant finds him and defendant is responsible

for all natural and probable consequences of his tortious conduct.  When a pre-existing injury or

condition exists, defendant must compensate the victim only for the full extent of the aggravation

of that condition caused by defendant's fault.  Swayze v. State Farm Mut. Auto. Ins. Co., 184

So.3d 81, 84 (La. App. 2d Cir. 2015); Ward v. Davidson, 125 So.3d 1236, 1241 (La. App. 2d Cir.

2013).

14.    "A tortfeasor is only liable for the direct and proximate results of his wrongful act,

including aggravation of any pre-existing injuries.  Although a tortfeasor takes his victim as he

finds him, he cannot be liable for injuries not attributable to his wrongful act." Cormier v.

Cushenberry, 147 So.3d 256, 261 (La. App. 4th Cir. 2014) (citing Tompkins v. Savoie, 10 So.3d

294, 301 (La. App. 5th Cir. 2009)).  Plaintiff has the burden of proving a causal relationship

between the damages claimed and the subject accident by a preponderance of the evidence.  Ward, 125 So.3d at 1239 (citing Lewis v. Wallace, 110 So.3d 1228 (La. App. 2d Cir. 2013)).  Plaintiff has satisfied his burden of proof in this regard, as reflected above, but only as to the aggravation or exacerbation of plaintiff's pre-existing conditions.

15.     Applying these principles, the court finds that the United States is liable for the negligence of its employee, Orlander S. Cassimere, Jr., and is responsible for all natural and probable consequences of his tortious conduct.

16.     With respect to comparative fault, Louisiana law states:

> In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable.  If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death or loss.

La. Civ. Code art. 2323(A).

17.     In Louisiana, a party's failure to wear a seat belt is "inadmissible to prove failure to mitigate damages or comparative negligence . . . with respect to the liability of the parties in th[e] suit."  Miller v. Coastal Corp., 635 So.2d 607, 610 (La. App. 3d Cir. 1994).  La. Rev. Stat. § 32:295.1(E) states:

> In any action to recover damages arising out of the ownership, common maintenance, or operation of a motor vehicle, failure to wear a safety belt in violation of this Section shall not be considered evidence of comparative negligence.  Failure to wear a safety belt in violation of this Section shall not be

admitted to mitigate damages.

18.     As noted above, Louisiana comparative fault law requires that the "percentage of fault of all persons causing or contributing to the injury . . . shall be determined, regardless of whether the person is . . . a nonparty." La. Civ. Code art. 2323(A). "The term 'empty chair' defendants refers to nonparties (or original parties to the suit dismissed prior to trial) that are alleged to be at fault by any party." Oddo v. Asbestos Corp. Ltd., 173 So.3d 1192, 1198 n. 3 (La. App. 4th Cir. 2015). In the instant case, defendant argued in its post-trial brief and closing argument that the City of New Orleans was at fault. Record Doc. No. 20 at pp. 5-7.

19.     Any negligence claim in this case against the City of New Orleans is rooted in Louisiana Civil Code articles 2315 and 2317.1. Louisiana Revised Statute § 9:2800 mirrors La. Civ. Code art. 2317.1 and establishes a duty of care over property owned by or in the custody of public entities. McClelland v. City of Shreveport, 108 So.3d 810, 813 (La. App. 2d Cir. 2013). A street is a "public thing[] that may belong to political subdivisions of the state," La. Civ. Code art. 450, and "cannot be alienated or appropriated by private use." Coliseum Square Ass'n v. City of New Orleans, 544 So.2d 351, 353 (La. 1989).

20.     Under La. Rev. Stat. § 9:2800, "a City cannot be liable for damages resulting from a defective condition without proof that it had actual or constructive knowledge prior to the occurrence of the particular vice or defect which caused the damage, and that the city had a reasonable opportunity to remedy the defect, but failed to do so." Id. at 814 (citing La. Rev. Stat. 9:2800; Campbell v. La. Dep't of Transp. & Dev., 648 So.2d 898 (La. 1995); Graham v. City of Shreveport, 31 So.3d 526 (La. App. 2d Cir. 2010)).

21.     "The standard . . . for public entities is not perfection but rather that the roads be kept reasonably safe for persons exercising ordinary care and reasonable prudence." <u>Fuselier v. City of Oakdale</u>, 130 So.3d 984, 987 (La. App. 3d Cir. 2014) (citations and quotations omitted). "The concept of constructive knowledge under La. C.C. art. 2317.1 imposes a reasonable duty to discover apparent defects in the thing in the defendant's garde or legal custody." <u>Theard v. Ankor Energy, LLC</u>, No. 11-2293, 2012 WL 1398439, at *3 (E.D. La. Apr. 23, 2012) (citations and quotations omitted). The evidence establishes that the bump on Canal Street was present long enough that the City of New Orleans had constructive knowledge, if not actual knowledge, of the defect and had a reasonable opportunity to remedy the defect, but failed to do so.

22.     Applying these principles, the court finds that the City of New Orleans is allocated 15 percent of the fault in this case for its failure to take corrective measures to prevent harm from the unreasonable risk presented by the bump on Canal Street. <u>See</u> <u>Langhoff</u>, 805 F.Supp.2d at 277 (assigning 85 percent fault to United States Postal Service truck driver for failing to exercise due care in executing a U-turn and left-hand turn and 15 percent of fault to plaintiff driver for his failure to exercise reasonable care); (<u>Ricks v. City of Shreveport</u>, 968 So.2d 863, 869 (La. App. 2d Cir. 2007) (affirming district court's finding that city had constructive notice of defect in storm-drain grate, into which pedestrian plaintiff stepped, and allocation of 25 percent fault to city).

23.     A degree of uncertainty is implicit in every quantum issue. <u>Coco v. Winston Indus., Inc.</u>, 341 So.2d 332, 335 (La. 1976); <u>Whitthorne v. Food Lion, Inc.</u>, 706 So.2d 193, 198 (La. App. 2d Cir. 1998); <u>Dowe v. Grady</u>, 540 So.2d 1040, 1045 (La. App. 2d Cir. 1989).

24.     General damages are those which may not be fixed with pecuniary exactitude.

Williams v. Placid Oil Co., 224 So.3d 1101, 1113 (La. App. 3d Cir. 2017). They involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle that cannot be definitively measured in monetary terms. The primary objective of general damages is to restore the party in as near a fashion as possible to the state he was in at the time immediately preceding injury. Schwartzberg v. Guillory, 213 So. 3d 1266, 1271 (La. App. 1st Cir. 2017) (citing Boudreaux v. Farmer, 604 So.2d 641, 654 (La. App. 1st Cir. 1992); Daigle v. U.S. Fidelity & Guar. Ins. Co., 655 So.2d 431, 437 (La. App. 1st Cir. 1995)).

25.     "The nature, relative severity, and bodily extent of injuries are qualitative factors that must first be considered by the trier of fact in awarding general damages. The duration of a plaintiff's injury symptoms and the duration of treatment are relevant quantitative factors that must also be taken into account." Id. at 1271-72 (citing Gillmer v. Parish Sterling Stuckey, 30 So.3d 782, 788 (La. App. 1st Cir. 2009); Thibodeaux v. USAA Cas. Ins. Co., 647 So.2d 351, 357 (La. App. 1st Cir. 1994)).

26.     Louisiana case law indicates that an appropriate general damages award for injuries similar to those suffered by Polk, without resultant surgical procedures, is within the wide range of $4,000 to $25,000. See Jones v. Swift Transp. Co., No. 09-4888, 2011 WL 2748156, at *3 (E.D. La. July 13, 2011) (upholding jury's award of $25,000 for past and future pain and suffering

to plaintiff with pre-existing degenerative disc disease who did not undergo a recommended surgery to address injuries to his cervical spine); Romano v. U.S., No. 93-0251, 1994 WL 479096, at *4 (E.D. La. Aug. 26, 1994) (awarding $4,000 in general damages for the aggravation, which lasted four months after defendant's vehicle struck plaintiff's, of a pre-existing cervical spine injury); Coghlan v. Smith, 971 So.2d 1197, 1199  (La. App. 4th Cir. 2007) ($10,000 in future general damages awarded to automobile accident plaintiff who was treated for whiplash injuries for over a year and had pre-existing degenerative disc disease but no evidence of any disc-related problems attributable to the accident); Poland v. State Farm Mut. Auto. Ins. Co., 885 So.2d 1144, 1151-52 (La. App. 1st Cir. 2003) (awarding $12,500 for minimal damage to plaintiff's face from air bag deployment and because degenerative disc disease in her cervical spine became symptomatic after the subject automobile accident); Skipper v. Berry, 762 So.2d 56, 60-61 (La. App. 3d Cir. 2000) (awarding $4,000 in general damages for aggravation of plaintiff's pre-existing lower back condition after defendant's truck struck plaintiff's vehicle); Morris v. United Servs. Auto Ass'n, 756 So.2d 549, 556 (La. App. 2d Cir. 2000) (affirming jury's award of $25,000 in general damages to plaintiff who suffered an aggravation of her pre-existing degenerative disc disease, the aggravating symptoms of which were successfully treated and resolved within ten months of the accident, and a temporomandibular joint (jaw) injury, which was also successfully treated within months of the accident); Odom v. Claiborne Electric, 623 So.2d 217, 224 (La. App.

2d Cir. 1993) (court affirmed general damages award of $18,500 for aggravation of pre-existing degenerative disc disease).

27.     "'Special damages' are those which must be specially pled or have a ready market value, that is, the amount of the damages supposedly can be determined with relative certainty. Some special damages, such as medical and lost wages, are easily measured." Schwartzberg v. Guillory, 213 So. 3d 1266, 1272 (La. App. 1st Cir. 2017) (citing McGee v. A C & S, Inc., 933 So.2d 770, 774 (La. 2006); Wainwright v. Fontenot, 774 So.2d 70, 74 (La. 2000)).

28.     A plaintiff may ordinarily recover reasonable medical expenses, both past and future, which he incurs as a result of the injury. Lawrence v. Gov't Emps. Ins. Co., 151 So.3d 917, 937 (La. App. 4th Cir. 2014) (citing White v. Longanecker, 637 So.2d 1213, 1218 (La. App. 1st Cir. 1994)).

29.     An injured party has a duty to make every reasonable effort to mitigate his own damages but is only required to act reasonably in minimizing the consequences of the injury. Simon v. State Farm Mut. Auto. Ins. Co., 43 So.3d 990, 999 (La. App. 3d Cir. 2010) (citations omitted).  Polk acted in furtherance of his duty to mitigate damages when he submitted to reasonable medical treatment, including receiving cervical facet injections after the accident. Joint Exhibit 4 at pp. 7, 10 and 33.

30.     There is no evidence suggesting that Polk was employed at the time of the accident.

Thus, plaintiffs cannot recover lost wages.

31.     An award of prejudgment interest is not permitted in cases brought against the United States under the FTCA.  <u>See</u> 28 § U.S.C. 2674 ("[t]he United States . . . shall not be liable for interest prior to judgment"); <u>accord</u> <u>Williams v. U.S. Postal Serv.</u>, No. 08-5040, 2009 WL 1402234, at *1 (E.D. La. May 14, 2009) (citing <u>Lucas v. United States</u>, 807 F.2d 414, 423 (5th Cir. 1986)).  Accordingly, no award of prejudgment interest is made in this case.

32.     Costs are awarded as a matter of course in favor of the prevailing party, in this case Polk, and against the party cast in judgment, in this case the United States.  Fed. R. Civ. P. 52(d)(1).  Costs are awarded in plaintiffs' favor and against the United States, but "only to the extent allowed by law," Fed. R. Civ. P. 54(d)(1), specifically to the extent permitted by 28 U.S.C. § 2412(a)(1).  <u>Grisso v. Massanari</u>, No. 01-1872, 2001 WL 1402726, at *1 (8th Cir. Nov. 13, 2001); <u>Sanchez v. Rowe</u>, 870 F.2d 291, 296 (5th Cir. 1989); <u>Clements v. Colvin</u>, No. 3:15CV20-DAS, 2015 WL 6554482, at *1 (N.D. Miss. Oct. 29, 2015).  Plaintiff must direct their motion to tax costs to the Clerk.  Fed. R. Civ. P. 54(d)(1); Local Rules 54.3, 54.3.1.

* * * *

To whatever extent, if any, that any of the foregoing conclusions of law also constitute findings of fact, or vice versa, they are adopted as such.

Based on the findings of fact and conclusions of law set forth above, **IT IS ORDERED** that judgment be separately entered in favor of plaintiffs, Edmond Stokes and Jeremy Stokes and

against defendant, the United States of America, in the amount of $9,386.13 (85 percent of the total damages of $11,042.51), together with postjudgment interest at the rate set forth in 28 U.S.C. § 1969, at defendant's cost.  Fed. R. Civ. P. 54(d)(1).

New Orleans, Louisiana, this _____ 2nd _____ day of April, 2018.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE